AUSTIN L. HAGGERTY, administrator, &c.,

*v.*

JOHN H. BADKIN.

[Decided March 8th, 1907.]

1. Pursuant to the formation of a contemplated partnership between defendant and intestate, the latter paid to defendant $500 for the benefit of the firm. Almost immediately thereafter intestate died, and pending his sickness defendant deposited such funds in a bank in his own name, and after intestate's death converted the money to his personal use.— *Held,* that intestate's death dissolved the partnership, after which defendant became a trustee of such fund for the benefit of intestate's estate, holding the same in a fiduciary capacity within the Bankruptcy act of July 1st, 1898 (*30 Stat. 551 § 17 subd. 4 ch. 541; U. S. Comp. St. 1901 p. 3428*), exempting from a discharge debts created by misappropriation while the bankrupt is acting in a fiduciary capacity.

2. Where a surviving partner wrongfully misappropriated funds which he held in trust for the estate of his deceased partner, the latter's administrator, in a proceeding in equity to compel the enforcement of a decree for the payment of the money, was entitled to process against defendant's body, which would be executed in the absence of proof that defendant was unable to obey the order.

In proceedings for contempt.

*Mr. James Steen* and *Mr. William D. Tyndall,* for the complainant.

*Mr. Archibald C. Hart,* for the defendant.

PITNEY, V. C.

This is a proceeding to compel the defendant to pay to the complainant the amount of a decree recovered by the latter against the former in this cause on the 5th day of January, 1905, for upwards of $500, besides costs.

The motion is resisted on two grounds.

The first and principal ground is a discharge in bankruptcy,

granted a year later by the district court of the United States, for the district of New Jersey, which purports to discharge defendant from all debts and claims which existed on the 10th day of May, 1905, *"excepting such debts as are by law excepted from the operation of a discharge in bankruptcy."*

The complainant replies to this defence that the debt for which the decree was granted is within that exception, and he relies on the fourth subdivision of section 17 of the Bankruptcy act, where are enumerated the several exceptions; the fourth of which is: "Such debts as were created by his fraud, embezzlement, *misappropriation* or defalcation while acting as an officer or in *any fiduciary capacity."*

The complainant contends that the debt herein arose by a *misappropriation* to his own use of money which had been confided to him by complainant's intestate in a *fiduciary capacity.*

To sustain this contention resort is had to the original bill in the cause, the answer thereto and the proofs and facts appearing at the trial, and the findings of the court thereon.

The bill charges that the intestate, in his lifetime, about the 20th of May, 1902, being in negotiations with the defendant in reference to a proposed partnership between them, deposited with the defendant the sum of $500 as and for his share of the partnership capital. The bill farther shows that immediately after such deposit complainant's intestate was taken violently ill, and died of the illness on May 26th, and alleges that the actual formation of the partnership was interrupted by such illness and was never consummated.

The answer of the defendant denies these allegations, and sets up that there were in fact negotiations between the parties as to the formation of such partnership, but that the plan for such partnership did not include the use of any capital; that the defendant was employed as a salesman for a furniture house, and complainant's intestate desired to join him in the business of selling furniture, and that in order to carry out that plan it was necessary for defendant to abandon his present business connection, which was valuable, and that intestate paid him the $500 as a personal compensation to him for giving up his then present lucrative job.

The cause came on for hearing before me as vice-chancellor and I found the issue in favor of the complainant, and as a matter of fact, that the $500 was paid to the defendant as a contribution to partnership assets and funds.

I have since read over the stenographer's minutes of the evidence and my oral reasons for the decree and am entirely satisfied with the result above stated.

It appeared at the hearing that the complainant's intestate, at the date of the transaction, May, 1902, was twenty-four years old and single, and resided with his mother in Hackensack, New Jersey, and worked as a clerk on a small salary for his uncle, a New York business man.

The defendant was a married man, about fourteen years older than intestate, and lived with his wife in Hackensack.

He was a salesman on a salary of $30 per week for a New York furniture house.

Neither of the parties had any capital nor were either engaged in any business of any sort for themselves.

The defendant kept no bank account, but brought his weekly wage home to his wife every Saturday night, and handed it to her after the fashion of an ordinary mechanic.

In this state of affairs, about the 1st of May, 1902, the parties entered into negotiations to enter into the business of selling furniture as partners, and it was supposed that they would need a little capital in the business, presumably to pay traveling expenses and the like, which, under the arrangement between defendant and his employers, were paid by his employers in addition to his weekly wage. For the purpose of supplying this capital it was arranged that complainant's intestate should contribute to the business $500, and the defendant contribute his knowledge and familiarity of the business to stand as an equivalent for the contribution in cash by the intestate.

Complainant's intestate borrowed that sum from his uncle in a check dated May 17th, 1902, drawn by his uncle to his order. On the evening of May 19th (as near as the date can be determined) deceased took the check to the house of the defendant in Hackensack and there endorsed it over specially to him as his contribution to the capital.

Either at the moment of the endorsement or immediately after deceased was taken violently ill with malignant diphtheria.

Defendant took the check to New York and opened an account in his own name in a bank and deposited the check to his own credit. The date of the entry in the book is May 20th.

He called to see the deceased the same evening and found him very ill. They had some conversation on business matters heard in part by the deceased's mother, who heard the deceased say to the defendant, "Let that remain for a few days."

It appeared that no written contract had as yet been entered into between them, but typewritten sheets embodying a contract, with corrections, were found in the possession of the deceased. He died on the 26th of May.

Defendant called at once upon the uncle who had advanced the money, and the uncle recited to him the terms of the contract as hereinbefore stated, and he admitted it to be correct. He speedily used the $500 for his personal use.

The evidence satisfied me that the terms of the contract of partnership were substantially agreed upon, but that the intestate desired to have them reduced to writing.

Under these circumstances the question is whether the debt is excepted from the effect of the discharge in bankruptcy, and that question depends on whether it was received in the first place or afterwards detained by the defendant in a *"fiduciary capacity."* That it was so received or detained I think there can be no doubt, if we give to these words their ordinary meaning.

Money is received or detained by one from another in a fiduciary capacity, when, in the mind of the person handing the money to the other, as such mind is known to that other, it does not become the absolute money and property of that other to do with as he chooses as his own money, but is received by him for a particular purpose in which a person or persons other than the person receiving it is or are interested.

If two persons are in partnership and one is acting as cashier or financial manager and the other pays money to his partner to be used in partnership business, the money so paid is received in a fiduciary capacity. The receiver holds it in trust for the partnership and for the benefit of the partners in proportion to their

several interests, and neither partner has the right to appropriate one dollar of it to his individual use without the consent, express or implied, of the other party.

Each partner for all the purposes *within the scope of the partnership* becomes the agent of each other partner and of the partnership entity, and when a present partnership is dissolved by death of one of the partners the survivor at once becomes a trustee for the representatives of the deceased.

Now, it seems to me, this sort of *fiduciary capacity* is clearly within the language of the act.

The words "fiduciary capacity" do not, in my judgment, refer to a technical trust such as forms the ordinary basis of treatises on that subject.

Mr. Hill, in his introduction to his work on *Trustees* (at *p. 1*), defines a trustee as, in the widest meaning of the term, "A person in whom some estate, interest or power in or affecting property of any description is vested for the benefit of another." And he says that that definition also extends to bailees, factors and agents whose duties in their fiduciary character are recognized and enforced at common law.

And Mr. Willis, in his treatise, published in Lord Eldon's time (at *p. 1*), gives the same definition. The same effect is Mr. Perry in his book, section 1.

The original Bankrupt law of 1841 provided in its first section that

"all persons whatsoever residing, &c., owing debts which shall not have been *created in consequence of a defalcation as a public officer, or as executor, administrator, guardian or trustee, or while acting in any other fiduciary capacity*"

might apply to be discharged in bankruptcy.

The fourth section provided that no person who, after the passage of this act, should apply trust funds to his own use should be discharged.

Under that legislation the supreme court of the United States, in *Chapman* v. *Forsyth, 2 How. 202,* held that a balance due from a mercantile factor to his principal arising out of the ordinary dealings between factor and principal is not a fiduciary debt in the

meaning of that act. Justice McLean, in delivering the opinion of the court, held that the cases enumerated in the first section, namely, defalcation by *public officer, executor, administrator, guardian and trustee,* were special trusts, the "other fiduciary capacity" mentioned must mean the same class of trusts, and says "the act speaks of technical trusts and not those which the law implies from the contract." He then refers to the fourth section of the act which provided that the discharging certificate, when duly granted, shall in all courts of justice be deemed a full and complete discharge of all debts, contracts and other engagements of said bankrupt as are provable under the act, and may be pleaded as a complete bar. And the court further held that the creditor entitled to the exception must appear and show in the bankrupt court that he was entitled to the exception and that the court for that reason had no jurisdiction as to his claim.

Notwithstanding this decision the supreme court of New York four years later, in *White* v. *Platt, 5 Den. 269 (1848),* under the same act, held that a debt was not barred by an act of bankruptcy which arose under the following circumstances: Defendants were indebted to plaintiff in a sum certain. They transferred to him certain promissory notes as collateral to secure the indebtedness. Before the maturity of these notes the plaintiff returned them to the defendants to collect them on plaintiff's account as his agent. Defendants collected the notes and did not account to plaintiff therefor. The court held that they received them in such a fiduciary capacity that they were not discharged by a discharge in bankruptcy. This case has never been doubted, but was cited with approval by Judge Strong, speaking for the supreme court of the United States, in *Clark* v. *Iselin, 21 Wall. 360* (at *p. 368*). Here a transaction in all respects similar to that involved in *White* v. *Platt, supra,* is thus characterized in the headnote:

"When a person, borrowing money of another, pledges with that other a large number of bills receivable as collateral security for the loan (many of them overdue), the pledgee may properly hand them back to the debtor pledging them, for the purpose of being collected, or to be replaced by others. All money so collected is money collected by the debtor in a *fiduciary capacity* for the pledgee."

I stop here to say that the distinction between the New York case and the one in *Chapman* v. *Forsyth, supra,* is one which runs through all the cases and is noticed by the judges, namely, that a factor who sells goods for a principal naturally and in the ordinary course of business mingles the proceeds of the sales with his own money and the amount at once becomes a simple debt, and that the principal or consignor of the goods is presumed to have notice of the ordinary course of business. In fact it is a pure mercantile transaction resulting in an implied contract and the natural remedy is by action of assumpsit at common law. In the case in New York and others I shall have occasion to cite there could be no such usual course of business, and it was the duty of the debtor defendants, as soon as one of the collateral notes entrusted to them for collection was paid, to transmit the proceeds *instanter* to their creditor.

The act of 1867 varied in its language from that of 1841. It provided, not in the first section, as in that act, but in the thirty-third section, that "no debt created by the fraud or embezzlement of the bankrupt or his defalcation as a public officer or while acting in any fiduciary character" shall be discharged under the act. The contrast between this section of the act and the corresponding section of the prior act is manifest. By dropping out the word "other," found in the first section of the old act, the legislature divorced the words "fiduciary capacity" from the list of specific trust positions enumerated in the older act. Moreover its position in the statute is significant. And this was the view taken by many federal and state courts when that act first came under judicial consideration. Judge Blatchford, then district judge, so held in *Ex parte Seymour, 6 Int. Rev. Rec. 80; 1 Ben. 348,* and his view was approved by Justice Nelson of the supreme court of the United States in *In re Kimball, 6 Blatchf. 292,* and by many other judges.

As late as 1882 Judge Pardee followed those judges in *Fulton* v. *Hammond, 11 Fed. Rep. 291.* In that case Hammond had received from the clerk and master in the chancery court of Lincoln county, Tennessee, a sealed bill made to him in his official capacity for a large sum of money for collection, signing therefor a receipt (containing a copy of the note) in these words: "I

receive said note to collect without suit, if practicable. If not, I am to employ counsel and collect by suit if necessary." In a suit by the successor in office of the original payee to recover the amount collected by Hammond the latter pleaded a discharge in bankruptcy. Judge Pardee declined to allow the plea, referring to *White* v. *Platt, supra,* and the cases decided by Judge Blatchford and Justice Nelson above cited, and held that the distinction is clear between the case of a commission merchant or cotton factor selling goods in the ordinary course of business and a man employed to collect money. He shows distinctly and clearly that the case of *Chapman* v. *Forsyth, supra,* does not apply to the act of 1867. So far as I can find *Fulton* v. *Hammond* has never been questioned.

But notwithstanding the line of cases of which *In re Kimball* is one, a somewhat different construction was finally put upon the act of 1867, and a different line of decisions was adopted which culminated in *Hennequin* v. *Clews, 111 U. S. 676 (1884).*

Hennequin was a French merchant doing business under a letter of credit on London issued by Clews & Company, New York bankers. Hennequin's practice was to draw upon the strength of his letter of credit on Clews & Company on time and before the draft matured to put Clews & Company in money to meet it. The transaction amounted to an acceptance in advance by Clews & Company of Hennequin's bills of exchange, but no debt arose from Hennequin to Clews & Company until the latter was obliged to pay the draft. In point of fact no debt ever did arise, because Hennequin always provided funds in advance. But in order to secure Clews & Company according to mercantile custom, Hennequin deposited with Clews & Company certain collateral securities in the shape of negotiable bonds. In that state of things Clews, being pressed for money, pledged or disposed of the collateral deposited with him and then failed, and got a discharge in bankruptcy. The court of appeals of New York (*77 N. Y. 427*) indirectly, and the supreme court of the United States (*111 U. S. 676*) directly, held that his discharge in bankruptcy released that particular debt.

Justice Bradley, speaking for the latter court, held that the question was covered by the previous case of *Neal* v. *Clark, 95*

*U. S. 704.* In dealing with the question, however, the learned justice (at *p. 680*) gives a long list of cases in which the federal and state courts had taken a contrary view, including therein the cases decided by Judge Blatchford and Justice Nelson, *supra,* and a case in Missouri and several others, citing only two cases in accord with the decision which the court was pronouncing.

But (at *p. 683 et seq.*) he shows that the English authorities dealing with nearly or quite similar language were decidedly the other way. He does not cite the case of *Fulton* v. *Hammond, supra,* decided by Judge Pardee.

The case of *Neal* v. *Clark, supra,* referred to by Justice Bradley in *Hennequin* v. *Clews,* was this: The executor of an estate sold some of its assets to Neal at somewhat of a sacrifice. The executor was then a man of large property and undoubted solvency. Neal made no inquiry as to the condition of the estate, and the executor gave him as a reason for selling the securities that the estate was in debt to him for moneys advanced. Ten years after Neal purchased the bonds and seven years after the executor had become insolvent and left the state, after having previously given a new bond as executor, Clark and Holland as sureties on that bond, brought an equity suit against Neal and others and charged the executor with a *devastavit* in selling the bonds to Neal, and that Neal, in view of the circumstances under which he received the bonds, became a participant in that *devastavit.* Neal had been discharged in bankruptcy in the meantime and pleaded his discharge in the suit. The Virginia court held him liable on the *devastavit,* and refused him the benefit of his discharge in bankruptcy, which discharge contained the same exception as that found in the one dealt with here. He was held liable in the Virginia courts on the ground that he had been guilty of fraud or embezzlement under the act of 1867. The force of the words "acting in a fiduciary capacity" were not at all involved. The supreme court of the United States held him entitled to the benefit of the discharge on the distinct ground that the debt was not "created by the fraud or embezzlement" of the bankrupt.

With great respect I am unable to see how that decision can

31

be said to directly support the decision in *Hennequin* v. *Clews,* to except Clews from the charge of fraud or embezzlement.

*Hennequin* v. *Clews* was followed by *Palmer* v. *Hussey, 119 U. S. 96 (1886)*. There the plaintiff had loaned to Hussey a large quantity of United States bonds under a written contract by which Hussey agreed to hold the bonds subject to the plaintiff's order, collect and pay him the coupons free of charge, and "allow him two per cent. per annum interest on the par value of the bonds." The acceptance of that contract by the plaintiff from Hussey amounted to an implied permission to Hussey to make use of the bonds in his business, presumably by borrowing money on them, for how otherwise was he able to pay interest for their use? And if he was permitted to use them by borrowing money on them, they were, of course, at the ordinary risk of mercantile transactions. The case cannot be distinguished from any ordinary loan of money.

Another case was *Noble* v. *Hammond, 129 U. S. 65 (1888)*. There Hammond had a claim against a railroad company, and, for his own convenience, drew an order on the company in favor of Noble, who was engaged in business, for the amount, and handed it to him for the purposes of collection. Noble asked Hammond what he was to do with the money when collected, and was told by Hammond to keep the money until called for. That was Hammond's account of it. Noble's account was that he was to keep and use the money until called for. In any point of view it was plain that Noble expected Hammond to keep the money as an ordinary deposit as a bank would keep it. Hammond was a business man using considerable sums of money, in perfectly good standing and having no reason to suppose that he was liable to financial trouble, and while in that condition collected $1,000 from the railroad and mixed it with his own funds. Shortly afterwards, through an unanticipated business loss, he was compelled to go through bankruptcy. It was found as a fact that there was no evidence tending to show actual fraud or any fraudulent intent in defendant's mingling the money with his own. The supreme court held that he was discharged by those proceedings. There it was plain that the transaction amounted to a loan by Hammond to Noble.

A still later case is *Upshur* v. *Briscoe, 138 U. S. 365 (1890)*. In that case one Andrews made a present to his daughter Annie of $10,000 and placed the money in the hands of·Briscoe, accompanied with a written contract which amounted to a special settlement of the money upon his daughter and her heirs, and at the same time to an absolute covenant on the part of Briscoe sooner or later to pay the whole sum of money with interest. Briscoe thereby became an absolute debtor and at liberty to treat the money as his own. It was not contemplated or provided for that he should hold the money as trustee and invest it for the benefit of the *cestui que trust*. The transaction amounted to an absolute obligation on Briscoe's part. Under those circumstances the court held that the discharge in bankruptcy barred a claim against him personally, but the court enforced it against an estate which he had transferred to his wife fraudulently in anticipation of bankruptcy. This was, on its face, a "technical trust," and hence was within some of the definitions given by the judges in construing the language here in question. They said the words "fiduciary capacity" referred to a "technical trust." But the court, in *Briscoe* v. *Upshur*, did not rely on the form of the affair, but on the actual substance, and distinctly relied on the fact that an absolute debt by Briscoe was created by the instrument.

We come now to the act of 1898. The language of that portion of the act here in question is variant from the act of 1867 above cited, and is as follows: "Except such as were created by his fraud, embezzlement, misappropriation or defalcation while acting as an officer or in any fiduciary capacity." The act of 1867 speaks of a debt created by the fraud or embezzlement of the bankrupt or by his defalcation as a public officer or while acting in any fiduciary capacity. Here the word "misappropriation" is added. The meaning of that word as given in the dictionaries is "wrong appropriation" (Webster), and according to the Encyclopedic Dictionary "to appropriate wrongly or wrongfully; to turn or put to a wrong purpose; the act of misappropriating or turning to a wrong purpose."

I can well perceive that, as used in this statute, the misappropriation must have been consciously done. The party must have

known and felt at the time that he was misappropriating the money.

The only case in the supreme court of the United States to which my attention has been called, construing this part of the act of 1898, is *Crawford* v. *Burke, 195 U. S. 176 (1904)*. That was a suit much like *Hennequin* v. *Clews*. The bankrupt was a broker who, as a part of his business, bought, held and carried stocks on a margin for his clients, and in the ordinary course of his business bought and carried stocks for Burke. The transactions between them were the ordinary gambling transactions in stocks carried on a margin. While so doing the bankrupt sold out his principal's stock without his knowledge. Pending a suit in trover to recover damages for converting the stocks so sold the broker obtained his discharge in bankruptcy and pleaded it *puis darrein continuance*. It was held by the supreme court of Illinois that the discharge was no bar. On error to the supreme court of the United States that court held that the fiduciary capacity did not exist. The distinction between that case and the present is clear.

It remains to consider some cases in our own state. Among them are *Gibson* v. *Gorman, 44 N. J. Law (15 Vr.) 325*. There the question arose as to the effect of a discharge in bankruptcy under the act of 1867 upon a judgment recovered in assumpsit. The debt arose out of two payments by the plaintiff in the judgment to the defendant in the judgment of the advance money or deposit on a purchase of lands which the defendant had for sale as an agent. The money was paid to him in the ordinary course of business. The sale in one instance was never completed on account of some supposed defect in the title, but the deposit was held by the agent for a long time in hopes that the title would be completed. In the other case the advance payment was withheld under a claim of commissions. Both sales fell through. It was held that neither of the sums was received in a fiduciary capacity, but were paid in the ordinary course of business in which the parties were engaged, and it was only by reason of what was claimed to be the defect in the title in the one case and a misunderstanding as to price in the other that the plaintiff was entitled to recover at all.

Another case is *The Smith & Wallace Co.* v. *Lambert, 69 N. J. Law (40 Vr.) 487.* That case was on demurrer to a replication to a plea of discharge in bankruptcy which set up simply that the cause of action was excepted from the operation of a discharge in bankruptcy because it was created by fraud. It was held that the replication was bad. The question here involved was not there involved or discussed.

The latest case is *Reeves* v. *McCracken, 69 N. J. Eq. (3 Robb.) 203.* The bill in that case was filed for an account of moneys received by McCracken to the use of the complainant in the sale of lands conveyed by the complainant to the defendant in trust for complainant. The fact was that it had been so conveyed by complainant to defendant in fraud of complainant's creditors, and that no written declaration of trust had been made. It was held that the money could not be held to have been received in a fiduciary capacity, because there could be no trust in the case—*first,* because no trust was declared in writing, and *second,* because the fact that the conveyance as between the parties was valid and binding, and the complainant could never have recovered back the land from the defendant on the ground of a lack of consideration for the conveyance, but was absolutely bound by it because made to defraud creditors.

The learned vice-chancellor does indeed cite and comment upon many of the cases I have already cited, and relies upon them to show that only a technical trust, so called, is within the meaning of the words "fiduciary capacity" as used in the seventeenth section of the Bankruptcy act. But, with great respect, I do not think that that question was involved in the case before him; and further, I am of the opinion that the case is clearly distinguishable from the present.

The complainant herein appeared before the judge in bankruptcy and objected to the discharge of the defendant on the ground of fraud in the creation of the debt, and the learned judge was unable to find any fraud in the case as presented to him, which was simply the pleadings in the suit in equity which resulted in the decree. I do not find from his opinion that he discussed the question of fiduciary capacity.

The question whether the claim is expected from the discharge

is one for the forum where it is pleaded to determine, and hence is entirely within the jurisdiction of this court, as held in *Marshall Paper Co.* v. *Train, 102 Fed. Rep. 872; 43 Cir. Ct. Ap. 36.*

1 have already referred to the reasoning by which the courts have held that the ordinary relation between factor and principal was not fiduciary within the meaning of that word here involved. It is that those transactions are mercantile transactions in which the principal must have known that his factor would, in the ordinary course of business, mingle the money received from the sale of his goods with his own, and that the ordinary relation of debtor and creditor arose out of those transactions, and that it was not the duty of the factor to earmark or segregate the proceeds of the sale of his principal's goods and remit at once. In fact, the ordinary course of business in such cases renders such restrictive dealing impracticable. The principal often obtains from the factor money in advance upon his goods, and the goods are not sold ordinarily in a lump, nor is the payment received in a single lump. The principal relies upon the personal responsibility of his factor. The courts held that it was and is contrary to public policy, as manifested in the Bankrupt law, to except such a large class of unfortunate creditors from its benefits. This consideration covers the case in *2 How.* cited hereinbefore, and all cases of that character.

The same consideration applies in a less striking degree to the case of *Hennequin* v. *Clews.* There, as we all know, Mr. Clews, like all bankers engaged in the business of issuing letters of credit, had numerous letters of credit outstanding in various parts of this country and Europe. He could not at any moment know how many drafts had been drawn against him upon which he was liable. He could only know the extent of his possible liability at any moment. He did know that his failure to meet one of those drafts would create great disturbance in mercantile circles, and he was justified by mercantile custom in going to extreme lengths in saving himself from a default in accepting and paying any such draft, and that it was to the interest of the holders of his letters of credit, especially of those who had drawn against him, that his insolvency should be averted. Among those who may have drawn upon him was Hennequin.

Under these circumstances it is by no means a stretch to say that mercantile usage justified him in devoting all these collaterals which he held as security from the holders of his letters of credit to protect himself and his customers, if practicable, from the consequences of failure to protect the drafts drawn by the holders of the letters. The situation brings him without the policy of the law.

Coming now to the case in hand, I find the present case not within the principle upon which those cases were founded, nor within the facts involved in those cases. It had nothing of a mercantile character. The defendant was not engaged in any business which required the use of money. He had no bank account, and opened one in his own individual name with the very money handed to him by complainant's intestate, and immediately after the intestate's death drew it out of bank for his personal use. I think the case is clearly within the case of *White* v. *Platt, supra,* and is within the definition of the words "fiduciary capacity" found in the headnote to *Clark* v. *Islin, supra,* and it is also within the case of *Fulton* v. *Hammond,* decided by Judge Pardee in the federal court, and cited above. It is also within the ruling of the supreme court of South Dakota in *Shipley* v. *Platts, 97 N. W. Rep. 1 (1903).* There the plaintiff, the proprietor of a laundry, employed the defendant as a distributor and collector of laundry material, and to collect from the patrons of the laundry their current dues and return the same to the plaintiff, less the defendant's commissions. In an action to recover the moneys so collected and not paid over, defendant set up his discharge in bankruptcy, and the court, relying mainly on *White* v. *Platt, In re Kimball, Fulton* v. *Hammond,* and other cases in the same line, held the discharge no bar. It is true the court did not refer to the cases I have reviewed, decided by the supreme court of the United States.

As applicable to the whole position here, I refer to the case of *Burdick* v. *Garrick,* decided in the vice-chancellor's court by Vice-Chancellor Stuart, and affirmed on appeal by Lord-Chancellor Hatherly and Sir G. M. Giffard, lord-justices. *L. R. 5 Ch. Ap. 233 (1870).* There the contest was over a sum of money held by an agent acting under a power of attorney to sell

lands, with power to invest the proceeds for the benefit of the principal, in the agent's own or anyone else's name. The agent never did invest the money, but deposited it in a bank to the credit of a firm of which he was a member, and it was held that the agent could not set up the statute of limitations, and that the bill in equity was a proper remedy. The judges distinguished *Foley* v. *Hill, 2 H. L. Cas. 28,* where it was held that the relation between an ordinary depositor in a bank was not that of trustee and *cestui que trust,* but of debtor and creditor. That case has the same characteristic as that of *White* v. *Platt, Fulton* v. *Hammond* and *Shipley* v. *Platts,* above cited, namely, that the money or property was placed in the hands of the defendant for a specific purpose which made him a trustee and his situation that of a fiduciary.

But whatever may have been the character in which the defendant herein received the money in the first instance, there can be no doubt as to the character in which he held it at and after the death of the intestate; that death dissolved the partnership at once, and the defendant's legal title to the money became absolute. But he held that legal title strictly in trust for the complainant's intestate. No business had ever been done under the partnership, so that he had no title, on a settlement of the partnership affairs, to any part of it. Feeling the force of this, he set up in his answer to this action an absolute title in the whole sum under what he alleged to be the contract between the parties, namely, that he was to have that money, not as a contribution to the partnership funds, but as compensation to himself personally for giving up his present position as salesman. I found that issue against him expressly, and I found impliedly that, as the partnership business had been arrested and the partnership dissolved by the death of intestate before anything had been done under it, the complainant was entitled to the whole fund.

I have said that on the death of the intestate the partnership was at once dissolved and the absolute legal title to the money became vested in the defendant, and that he held it in trust for the partnership, which in this case amounted to holding it in trust for the complainant's intestate. It was on this ground that

the action was brought and maintained in this court. That this is the true statement of the relations between the parties cannot be doubted. In *Lew. Trusts (8th ed., reprint by Flint)* 277 *(1888)* this relation of partners to each other is distinctly recognized, and while it has been held that that relation does not go so far as to prevent the application of the statute of limitations, it seems quite clear that the relation between the personal representatives of the deceased partner and the surviving partner is quite distinct from that between a principal and his factor or agent in the ordinary mercantile relation out of which an action of assumpsit at law will arise, and the universal rule is that resort must be had to a court of equity.

It is true that the doctrine that the surviving partner holds the property of the partnership in trust for the personal representatives of the deceased partner has been repudiated and the contrary held in cases where the rights of third parties or the statute of limitations was involved. The leading case on that subject is *Knox* v. *Gye, 5 Eng. & Ir. Ap. Cas. 656 (1872).* There the sole question was the operation of the statute of limitations. Lord Westbury uses the following language: "Another source of error in this matter is the looseness with which the word 'trustee' is frequently used. The surviving partner is often called a 'trustee,' but the term is used inaccurately. He is not a trustee, either expressly or by implication. On the death of a partner the law confers on his representatives certain rights as against the surviving partner, and imposes upon the latter correspondent obligations. *The surviving partner may be called, so far as these obligations extend, a trustee for the deceased partner, but when these obligations have been fulfilled, or are discharged, or terminate by law, the supposed trust is at an end."*

Against this mere *dictum,* Lord Hatherly (at *p. 678*) vigorously protests. The other law lords, Lord Chelmsford and Lord Colonsay, agreed that the statute of limitations applied without discussing the question of the fiduciary relations between the parties or relying on it. All agreed that the bill in chancery was the proper remedy. Lord Westbury did indeed hint that the old action at law for an account would lie.

Mr. Clement Bates (*2 Bates L. Part.* §§ *718, 719*) reviews

the language in *Knox* v. *Gye* with ability, and cites cases in support of his criticism.

Whatever may be the proper language to apply to and describe the relation existing between the complainant's intestate and the defendant, it is quite clear that the obligations arising out of the circumstances under which the defendant became indebted to the complainant's intestate were not in the ordinary course of mercantile business, and did not give rise to the right to sue and recover in an ordinary action at law, because it was within the province of the defendant to set up and prove that the fund had become involved and depleted by legitimate use in the partnership venture to which it was contributed as capital before that partnership was dissolved by death. Hence the complainant's proper remedy was a bill in this court for an accounting, precisely as if such a state of facts as I have indicated had existed.

Now, if we go back and review the opinions in the cases I have cited we will find that this distinction in the proper remedies is adverted to, and in a measure relied upon, in determining whether the debt is or not barred by the discharge. It is hardly necessary to advance arguments to show that, the trust relation being established, the use of the fund for his individual benefit was a misappropriation within the meaning of that word in the act.

For these reasons I am of the opinion that the defendant's debt, manifested by the decree, is not discharged by the decree of the bankrupt court.

The next defence set up by the defendant is his inability to pay. For this he relies upon his *ex parte* affidavit read at the hearing, in which he says he has a wife and one child, and re-recives $30 per week, or $1,560 per year, salary, and therefore he cannot pay anything. The same excuse was set up in answer to proceedings similar to these instituted after decree and before bankruptcy proceedings were taken. Then, as now, the defendant relied upon his *ex parte* affidavit. Of course, the complainant is entitled to have the defendant subjected to examination. In the former case the proceedings were dropped or suspended on a verbal undertaking, at my suggestion, that the defendant should pay $5 per week, which he did for two weeks, and then

took bankruptcy proceedings. In the present case I think it will be no hardship on the defendant to contract his living expenses to the extent of $5 per week. This is a mere suggestion to save expense, and need not be accepted by either party, but each may fall back on the regular practice of an oral examination.

The case is clearly one justifying the extraordinary process of the court.

The obligation which is the foundation of this suit arose as soon as the intestate died. It was then the duty of the defendant to preserve the fund so that he could account for and pay it over to the personal representatives of the deceased when appointed and duly accredited. The equitable wrong committed by the defendant was the misappropriation of that fund by treating it as his own and applying it to his personal use.

If the complainant's right had been a legal one, enforceable in a court of law, it would have warranted process against the body. As, however, his right was an equitable one, and enforceable in this court, he is entitled to the corresponding remedy of this court, subject, however, to this exception, that while in a court of law the process against the body would be issued without regard to the defendant's personal ability to pay, and he be remitted to his remedy by insolvent proceedings, in this court he will not be deprived of his liberty if it appears in advance that he is unable to respond and obey the order of the court.

This view is entirely in accord with that of the court of errors and appeals in *Grand Lodge Knights of Pythias* v. *Jansen, 62 N. J. Eq. (17 Dick.) 737*. The foundation of the decree in that case, as shown by the opinion in the original cause *(56 N. J. Eq. (11 Dick.) 63)*, was briefly as follows: Jansen and others were members of Germania Lodge, No. 50, of the Knights of Pythias, and became dissatisfied with some of the conduct of the grand lodge, and, being aware that any failure to obey and observe the laws of the grand lodge would result in a forfeiture to the grand lodge of all the funds of the inferior lodge, amounting to hundreds of dollars, deliberately set to work and, in defiance of an interlocutory order of this court, distributed the money among themselves. The result was that later

on a final remedial decree was made against all of them who actively engaged in the scheme, and they were directed to pay the money to the grand lodge.

Failing so to do, proceedings in attachment were taken against them on two grounds—*first,* for punitive purposes, in disobeying the interim restraining order of the court; *second,* remedial to the grand lodge for not paying over the money in obedience to the final decree. The real basis of the final decree was the wrong appropriation of the money in their hands after they had been enjoined by this court. On those contempt proceedings Jansen and others were adjudged guilty of contempt and committed to the custody of the sheriff. An appeal was taken from that order. The matter was argued both above and below by able counsel. Neither in the court below nor on appeal was the point taken that proceedings against the body were not proper or lawful, but the order below was reversed on the single ground that it appeared by the affidavits already in the case that the defendants were unable to pay the money, and therefore the imprisonment should not be imposed.

I will advise an order in accordance with these views.