In re Thomas R. HADDAD, Debtor.

Caroline HADDAD, Plaintiff,

v.

Thomas R. HADDAD, Defendant.

Bankruptcy No. 80–00343.
Adv. No. 80–0053.

United States Bankruptcy Court,
D. Nevada.

April 13, 1981.

Vernon A. Kalshan, Vizzard, Baker, Sullivan, McFarland, Bakersfield, Cal., for plaintiff.

Richard W. Horton, Lionel, Sawyer & Collins, Reno, Nev., for defendant.

## OPINION AND DECISION

BERT M. GOLDWATER, Bankruptcy Judge.

This is an action by Caroline Haddad (Caroline), the widow of Abe H. Haddad (Abe), brother and deceased partner of the debtor Thomas R. Haddad (Tom), objecting to both the general discharge of the debtor under 11 U.S.C. 727 and the dischargeabili-ty of certain claims against the debtor under 11 U.S.C. 523.

Abe and Tom were equal partners in a farming related business in Kern County, California, known as Golden H Packing Company (G.H.P.), until Abe's death on February 28, 1979. G.H.P. was, in turn, a 50% partner of LaVar Murdock in a potato farming business in Nevada known as Golconda Farms (Golconda).

Tom and Abe, doing business as G.H.P., purchased one-half interest in Golconda the year before Abe's death with $500,000 borrowed from the Bank of America (B of A) at Irwin, California, and a note to the seller for the balance of the purchase price of approximately $1,000,000. The sum of $500,000 due the B of A was on a letter of credit note signed by Tom and Abe.

In connection with each of these partnerships, Tom and Abe had certain insurance agreements. With respect to G.H.P. Abe and Tom executed a buy-sell agreement which provided, in part, that on the death of a partner, any insurance proceeds were to be paid to the estate of the deceased partner. The attorney who drafted the G.H.P. buy-sell agreement for Abe and Tom testified that his secretary failed to type in that part of the agreement which prescribed how the value of a deceased partner's interest was to be determined and consequently how much insurance would be needed to purchase a deceased partner's interest. Supposedly, had the agreement been typed correctly, a capital account value would have been used. The agreement is ambiguous as to whether the entire proceeds of the policy or proceeds equal to the capital account value were to be paid to Abe's estate. The agreement was signed by the respective wife of each partner and funded by insurance. Shortly after Abe's death, there was approximately $1,000,000 in insurance collected by G.H.P. and deposited by Tom in his own name. With respect to their interests in Golconda, each brother purchased a policy on the life of the other naming himself beneficiary. Premiums on these policies were paid by Golconda but charged to the respective partnership draw

of each brother. On the policy he had on Abe's life, Tom collected $751,561.64.

With the total insurance proceeds of approximately $1,750,000, Tom purchased three $500,000 certificates of deposit in his own name on March 30, 1979, and used the remaining $250,000 to pay debts of both G.H.P. and Golconda. Tom renewed the certificates of deposit from time-to-time, but continued to use certain amounts of the money to pay debts of G.H.P. and Golconda as well as to finance Golconda's crop year.[1] None of the proceeds were paid to Abe's estate as required by the G.H.P. buy-sell agreement.

Abe's will left his assets in a trust under the terms of which Caroline was to receive $500 per month as an income beneficiary. The executor of Abe's estate was his father, A. G. Haddad (A.G.) and the attorney for the estate was one William Anderson of Bakersfield, California.[2] Neither Anderson nor A.G. made any effort to determine the value of Abe's interest in G.H.P. or Golconda, but, at the time of Abe's death, both G.H.P. and Golconda had numerous creditors.[3]

In July of 1979, at the time the $500,000 B of A letter of credit note became due, Caroline was called to Anderson's office for a meeting with Tom. Anderson told her about the $500,000 B of A note then due and told her that there were insufficient funds in Abe's estate to pay the debts of the estate. At the meeting Tom agreed to pay one-half of the debt to B of A if Caroline agreed to pay the other one-half. Tom did not mention that he had collected the insurance, and in fact, on that date, he had $1,000,000 from the insurance proceeds in certificates of deposit in his own name.

Following the meeting at Anderson's office, Caroline and Tom met at the B of A. The B of A officer at the bank showed Caroline a continuing guarantee for all of Abe's debts signed by her in 1976 in favor of B of A. Caroline then paid B of A approximately $250,000 on the $500,000 note from her personal funds.

Defendant concedes here that Caroline is a creditor of Tom's by reason of her payment on the B of A debt.[4] Caroline's status as a creditor entitles her to object to both Tom's general discharge under Section 727 and the dischargeability of her claims against Tom under Section 523.[5]

Caroline objects to the general discharge of Tom under Section 727(a)(2) on the ground that Tom had the intent to defraud her husband's estate by transferring and concealing the $1,000,000 in insurance proceeds received by G.H.P. as a result of Abe's death. She reasons that had Tom not concealed the insurance proceeds from her and transferred them to his own name, the money would have been paid to Abe's executor pursuant to the buy-sell agreement, the debts of Abe's estate paid, and the trust created for her benefit.

Caroline objects to the dischargeability of certain claims against Tom under Section 523(a)(2), (a)(4), and (a)(6) on a number of grounds.

Under Section 523(a)(2) Caroline contends that Tom obtained money by either a false representation or actual fraud by not telling her that he had $1,000,000 of insurance proceeds on deposit the day she paid one-half of the debt to the B of A. She reasons that Tom obtained the benefit of her payment of $250,000 at a time when he was

1. At the time Tom filed bankruptcy on June 3, 1980, there was $400,000 insurance proceeds remaining.

2. Anderson, the attorney for the estate, and Stronge, the attorney who drafted the G.H.P. buy-sell agreement, use a joint letterhead which might be understood to make them partners, but their true relationship is unknown.

3. Unaudited statements show Golconda was solvent and G.H.P. was insolvent at the time of

Abe's death. Both are now in bankruptcy under Chapter 7.

4. The concession at the time of argument was based upon Caroline's right of subrogation against Tom as the surviving partner and one of the primary obligors on the B of A note.

5. Abe's present administrator has filed a claim against this estate, but has not filed any adversary proceeding relative to discharge or dischargeability of the claim.

primarily liable on the note. She contends she would not have made the payment had she known about the insurance even though she was liable for Abe's debts by virtue of her continuing guarantee to B of A.

Under Section 523(a)(4), Caroline contends that Tom is guilty of fraud while acting in a fiduciary capacity, because Tom, in his capacity as a partner, deposited the $1,000,000 in insurance proceeds in his own name and used the money at his own discretion.

Under Section 523(a)(6), Caroline contends that on the basis of *In re Frazzetta*, D.C.N.Y., 1 F.Supp. 122 (1932), Tom's deposit of the insurance proceeds of G.H.P. in his own name was willful and malicious injury to the property of Abe's estate.

## I.

11 U.S.C. 727(a)(2) provides:

(a) The court shall grant the debtor a discharge, unless—

\* \* \* \* \* \*

(2) the debtor, with intent to hinder, delay, or defraud a creditor or an officer of the estate charged with custody of property under this title, has transferred, removed, destroyed, mutilated, or concealed, or has permitted to be transferred, removed, destroyed, mutilated, or concealed—

(A) property of the debtor, within one year before the date of the filing of the petition; or

(B) property of the estate, after the date of the filing of the petition;

With respect to Section 727(a)(2) the issue is whether or not Tom should be denied a general discharge upon the ground that he had the intent to hinder, delay, or defraud Abe's estate by transferring and concealing the $1,000,000 in insurance proceeds.

■ To fall within the purview of Section 727(a)(2)(A), it is necessary that the debtor transferred and concealed property of his own within one year before the date of the filing of the petition. However, if the act complained of was done prior to the period required by statute, it may be shown that the act was in effect a continuing concealment, 4 *Collier on Bankruptcy* 727–7 (15th ed. 1980).

The G.H.P. insurance proceeds were deposited on March 30, 1979, the bankruptcy petition was filed on June 3, 1980.

■ There is a question whether (1) the debtor concealed property of his own and (2) whether the deposit more than a year before the filing of the petition could constitute a continuing concealment.[6] The debtor actually transferred property of G.H.P. rather than property of his own. But the Court need not resolve those issues because, even if the Court were to find that Tom transferred property of his own and that there was a continuing concealment, plaintiff Caroline failed to show that Tom had the requisite intent to hinder, delay, or defraud her husband's estate by depositing the insurance proceeds in his name.[7]

■ Intent is a question of fact, and the intent shown must be actual fraudulent intent, 4 *Collier, supra* at 727–10. Proof of actual fraudulent intent, requires a showing of bad faith on the part of the debtor and actual fraudulent intent, as distinguished from constructive intent, must be the intent of the debtor or the intent of someone acting for him. *Matter of Simon*, 197 F.Supp. 301 (E.D.N.Y.1961). In the *In re Rivas,* 268 F. 690 (S.D.Fla.1920), it was held that bad faith was not shown by the fact that the bankrupt collected money which he subsequently used for living expenses and some individual debts.

Bad faith on the part of the debtor has not been established, and bad faith cannot

**6.** The defendant raised these issues on oral argument.

**7.** Under Bankruptcy Rule 407, the plaintiff has the burden of proving the facts essential to his objection. The plaintiff must go beyond a showing of reasonable grounds for believing that the debtor committed any of the acts which prevented his discharge and adduce proof of the facts which will establish that the debtor committed the act charged.

be inferred when the debtor did nothing more than continue to pay the debts of G.H.P. and Golconda and there is an unknown as to what was due Abe's estate.[8]

## II.

In deciding Caroline's complaint for nondischargeability under 11 U.S.C. 523(a)(2), (a)(4), and (a)(6), the Court must be guided by the rule that exceptions to the dischargeability of a debt are construed strictly against a creditor's objections and liberally in favor of the debtor. *In re Green*, 2 C.B.C. 905, 5 B.R. 247 (Bkrtcy.N.D. Ga.1980). A different construction would be inconsistent with the liberal spirit which has always pervaded the entire bankruptcy system. *Neal v. Clark*, 95 U.S. 704, 24 L.Ed. 586 (1877).

Sections 523(a)(2), (a)(4), and (a)(6) provide as follows:

(a) A discharge under section 727, 1141, or 1328(b) of this title does not discharge an individual debtor from any debt—

\* \* \* \* \* \*

(2) for obtaining money, property, services, or an extension, renewal, or refinance of credit, by—

(A) false pretenses, a false representation, or actual fraud, other than a statement respecting the debtor's or an insider's financial condition; or

(B) use of a statement in writing—

(i) that is materially false;

(ii) respecting the debtor's or an insider's financial condition;

(iii) on which the creditor to whom the debtor is liable for obtaining such money, property, services, or credit reasonably relied; and

(iv) that the debtor caused to be made or published with intent to deceive;

\* \* \* \* \* \*

(4) for fraud or defalcation while acting in a fiduciary capacity, embezzlement, or larceny;

\* \* \* \* \* \*

(6) for willful and malicious injury by the debtor to another entity or to the property of another entity;

1. With respect to Section 523(a)(2), the issue is whether or not Caroline's claim against Tom for one-half ($250,000) of the B of A note is nondischargeable by reason of a false representation or fraud.

Section 523(a)(2)(B) requires that a statement respecting the debtor's financial condition be in writing. 3 *Collier on Bankruptcy* 523–49 (15th ed. 1980). The fact that the debtor had $1,000,000 in certificates of deposit on the day the note was paid certainly bears upon debtor's financial condition, but there was no written statement as required by Section 523(a)(2)(B).

As to a false representation under 523(a)(2)(A), the facts show that Caroline decided to pay one-half of the B of A debt after Attorney Anderson told her that there were insufficient funds in Abe's estate to pay all of the estate debts and, in fact, paid the debt after the B of A showed her the continuing guarantee she had signed in its favor. It appears that the representations which were made must have been either Anderson's or B of A's and not the debtor's.[9] Since there is no showing that the debtor encouraged Anderson to make the representation or that they were false, Tom's failure to mention the insurance proceeds or his concealment of the insurance proceeds cannot be considered a false representation or fraud. Fraud or a false representation cannot be implied from a failure to volunteer certain information. This is especially true when the statute requires

---

8. There was a comingling of the insurance proceeds paid to G.H.P. and the insurance proceeds paid to Tom. Assuming for the purpose of argument that $1,000,000 was G.H.P. money it is entirely unclear what Abe's estate was entitled to receive. G.H.P. was insolvent and Abe's capital account was likely a negative factor.

9. Anderson's statements were purely factual. There was no showing that he knew Tom held the insurance proceeds and his statement regarding the inability of Abe's estate to pay was true.

that a plaintiff bear the burden of proving moral turpitude or intentional wrong as elements of false representation and fraud in order to have a claim declared nondischargeable.[10] *In re Ashley*, 2 C.B.C. 949, 5 B.R. 262 (Bkrtcy.E.D.Tenn.1980). Fraud implied in law which may exist without imputation of bad faith or immorality is insufficient. *In re Danahy*, 45 F.Supp. 758 (W.D.N.Y.1942).

2. As to Section 523(a)(4), the issue is whether or not Tom committed an act of fraud by withdrawing the insurance proceeds from G.H.P. while he was acting in a fiduciary capacity as a partner.

■ Generally, the characterization of a debtor in a fiduciary capacity has been limited to express trusts and not to trusts that may be imposed because of the very act of wrongdoing out of which the contested debt arose. Thus, Section 523(a)(4) is not generally applicable to partners as fiduciaries. 3 *Collier, supra* at 523–99. However, in *Haggerty v. Badkin*, 72 N.J.Eq. 473, 66 A. 420 (1907), the Court held that when a partnership is dissolved by the *death* of one of the partners, the survivor becomes a *trustee* and holds the partnership moneys in a fiduciary capacity for the representatives of the deceased. Consequently, on the death of Abe, Tom became a trustee of the partnership moneys. But, Tom must have acted fraudulently in his fiduciary capacity in order for this debt to be nondischargeable within Section 523(a)(4).

■ In the case of *Neal v. Clark, supra,* the Court said that fraud means positive fraud or fraud in fact, involving moral turpitude or intentional wrong. Such a construction of the statute is consonant with equity and consistent with the object

and intention of Congress in enacting a general law by which the honest citizen may be relieved from the burden of hopeless insolvency. In *Haggerty*, the Court found the surviving partner guilty of fraud for the reason that after the partner's death, the surviving partner actually converted the money to his own use. In this case, there is no evidence that the debtor converted the money to his own use. Rather the evidence clearly shows that the debtor, while the money was in his name, used it to pay debts of G.H.P. and Golconda.

■ 3. Under Section 523(a)(6) the issue is whether or not the spending of the insurance proceeds amounted to willful and malicious injury by the debtor to the property of Abe's estate.[11] Plaintiff argues that this case is controlled by the holding of *In re Frazzetta, supra.*

In *In re Frazzetta*, there were three co-partners engaged in the real estate business. An agreement was drawn which provided that the partnership be dissolved, and gave one partner, namely Frazzetta, the power to perform all the uncompleted work of the firm. Frazzetta failed to account for any of the sums collected and subsequently filed a petition in bankruptcy. The plaintiff in *Frazzetta* objected to the debtor's dischargeability on two theories: (1) the debt was one created by fraud while acting in a fiduciary capacity and (2) the debt was one resulting from willful and malicious injury to property. The Court in *Frazzetta* held that the debt was nondischargeable but did not decide on which of the theories the debt should be declared nondischargeable. There was evidence that Frazzetta had destroyed all the checks, books, and

---

**10.** Additionally, there is no evidence that Caroline knew about the specific insurance used to fund the G.H.P. buy-sell agreement, but she did sign the buy-sell agreement which provided that any insurance proceeds were to be paid to the estate of the deceased partner. Concealment cannot be considered a false representation in light of the fact that Caroline was aware of the terms of the buy-sell agreement.

**11.** Injuries within the meaning of Section 523(a)(6) are not confined to physical damage

or destruction. The conversion of another's property without his knowledge or consent, done intentionally, without justification or excuse, to the other's injury, is a willful and malicious injury. However, a technical conversion, such as the one present in this case may lack any element of willfulness or maliciousness necessary to except the liability from discharge. 3 *Collier on Bankruptcy* 523–117 (15th ed. 1980).

papers of the partnership. There is no such evidence in this case.

The Court's reasons under Section 523(a)(6) are the same as to its reasons under Section 523(a)(2) and (a)(4). Section 523(a)(6) requires a showing of willful and malicious injury to property. This means a malicious, deliberate and intentional act which necessarily leads to injury. 3 *Collier, supra* at 523–115. There has been no showing that Tom possessed the malice required to fall within this section, and, particularly, there is no showing that the taking of the partnership money would necessarily lead to injury. There is no showing that Abe's estate was entitled to any of the proceeds, and, had Tom been successful, as he testified he thought he would be, in paying debts of G.H.P. and Golconda, he may have salvaged the businesses and no property or entity would have suffered injury.

Let judgment be entered that the defendant-debtor in this proceeding is entitled to a general discharge under Section 727 and Caroline's claims against him are dischargeable in this bankruptcy.