**In re Nancy Anne O'NEIL, Debtor.**

**STATE FARM INSURANCE COMPANY, Plaintiff,**

**v.**

**Nancy Anne O'NEIL, Defendant.**

**Bankruptcy No. 88–5743–8P7.**

**Adv. No. 89–007.**

United States Bankruptcy Court,
M.D. Florida,
Tampa Division.

June 29, 1989.

---

Thomas F. Capshew, Syprett, Meshad, Resnick & Lieb, P.A., Sarasota, Fla., for plaintiff.

Douglas A. Wallace, Bradenton, Fla., for defendant.

## FINDINGS OF FACT, CONCLUSIONS OF LAW AND MEMORANDUM OPINION

ALEXANDER L. PASKAY, Chief Judge.

THIS IS a Chapter 7 liquidation case, and the matter under consideration involves a challenge to the Debtor's right to a general discharge in bankruptcy. The Amended Complaint filed by State Farm Insurance Company (Plaintiff), although it appears to be a single-count Complaint, asserts a claim for relief under two separate causes of action. The first ground under which the Plaintiff objects to the Debtor's discharge is based upon § 727(a)(2)(A) of the Bankruptcy Code and alleges that the Debtor transferred property within one year before the date of the filing of the Petition with the intent to hinder, delay or defraud the Plaintiff. The second ground for relief asserted by the Plaintiff is based on § 727(a)(5) of the Bankruptcy Code, alleging that the Debtor failed to explain the loss of certain assets.

At the duly scheduled final evidentiary hearing, the following facts have been established which are relevant and germane to the issues under consideration.

In 1984 the Debtor and her non-debtor spouse, John G. O'Neil, and their three children moved to Florida. Originally, they purchased a home which was placed in the Debtor's name and subsequently, the deed was transferred to reflect the husband and wife as joint owners in 1986 or thereabouts.

Prior to moving to the State of Florida, Mr. O'Neil was employed as a manufacturer's representative in the State of Illinois. The Debtor handled most of the bookkeeping and banking for a business known as, "O'Neil and Santa Claus, Inc.", as well as other businesses that her husband engaged in throughout their marriage. In 1982 the Debtor's husband was engaged in a business called, "C & O Enterprises" in Illinois where the Debtor typed invoices for the company. Other than these short bouts of working with her husband and his ventures, the Debtor has not been employed outside the home and was not working at the time the Petition for bankruptcy was filed. It appears from the record that throughout her married life, the Debtor's husband maintained a joint checking account with his father, John L. O'Neil, and that the Debtor never questioned or objected to this financial arrangement. Upon moving to Florida, the Debtor's husband opened a checking account in the name of "Siesta Enterprises", which was the name that he chose in order to start a business which, in fact, never occurred, and although the Debtor maintained a checking account, it appears that the source of the funds in her account were all related to her husband's businesses.

In September 1985 the Debtor's son was involved in an automobile accident whereby he was charged with vehicular homicide.

A cash bond was required for her son's release for $40,000.00, which her husband, John G. O'Neil, posted. First, the Debtor wrote a check on her own account at First Presidential Savings and Loan Association in the amount of $14,016.00 (Exh. No. 6). This check was used to purchase two cashier's checks totalling $14,016.00 payable to John G. O'Neil (Exh. Nos. 8 and 9). Mr. O'Neil then endorsed this check over to the Manatee County Sheriff. The check for the balance of the bond was written on the account of Siesta Enterprises and made payable to the order of Central National Bank in the amount of $26,000.00 (Exh. No. 5). This check was also used to purchase a cashier's check payable to John G. O'Neil, which was then endorsed over to the Manatee County Sheriff (Exh. No. 7). John G. O'Neil, the Debtor's husband, posted the bond with the Manatee County Sheriff's office (Exh. Nos. 1, 2, 3 and 4). It is clear that the Debtor did not sign any of the four bonds of the depositor. On the contrary, the sole signer of the bonds as a depositor was John G. O'Neil, the Debtor's husband.

Subsequently, the cash bond for Michael O'Neil was reduced from $40,000.00 to $10,000.00. In accordance with the bond reduction on January 30, 1986, the Sheriff issued a check refunding $30,000.00 of the original $40,000.00 bond amount. Since John G. O'Neil was the sole depositor on the bond, the check was made payable to his order. The reverse side of the check shows that Mr. O'Neil endorsed the check to his father, John L. O'Neil in repayment of a loan dated October 28, 1985 (Exh. No. 10). The testimony of John L. O'Neil, the Debtor's father-in-law was consistent in that he received the money in repayment for a loan. It should be noted that the actual check issued by the Manatee County Sheriff's office was credited to the account of John L. O'Neil, at First Presidential Savings and Loan Association, but was subsequently destroyed in a fire. Accordingly, the Sheriff's department issued a new check payable to First Presidential Savings and Loan Association in the same amount to reimburse the bank for the monies it had previously credited to John L. O'Neil (Exh. Nos. 12 and 13). On August 14, 1986, the Sheriff's department issued a second check payable to John G. O'Neil in the amount of $10,000.00 representing a refund of the balance of the cash bond (Exh. No. 15). This check, like the first check, was issued solely to John G. O'Neil because he was the depositor on the bond. This check was deposited into an account which he and his father had jointly at the Central National Bank. Subsequently, Mr. O'Neil wrote a check on this account to Edwin T. Mulock, his son's attorney, for $3,658.59 (Exh. No. 21). Mr. O'Neil also wrote a check to his father, John L. O'Neil, in the amount of $10,000.00 in further repayment of monies loaned by John L. O'Neil toward expenses for the defense of the criminal case against their son, Michael (Exh. No. 22). These two payments exhausted the additional $10,000.00 refunded by the Sheriff. Prior to the commencement of this Chapter 7 case, the Debtor executed a Consent to Final Judgment making her individually liable for damages in the amount of $319,000.00 in favor of Margaret D. Harvey. On the same day, the judgment was partially satisfied, leaving an outstanding judgment of $100,-000.00. Harvey executed an absolute assignment of judgment, assigning to the Plaintiff in this adversary proceeding all of her interest in said judgment. Plaintiff has paid to Harvey $100,000.00 as underinsured motorist's coverage. On September 28, 1988, the Debtor filed a Chapter 7 Voluntary Petition in bankruptcy listing the Plaintiff as a creditor. At the final evidentiary hearing, the Court took judicial notice of the Debtor's Statement of Financial Affairs and Schedules, noting that the Debtor indicated in the first quarter of 1988 that she and her husband, a non-debtor, sold jointly owned shares of stock in two corporations, resulting in proceeds in the amount of $4,427.00 as the Debtor's share. On April 23, 1987, prior to the bankruptcy filing, the Debtor gave a deposition in the action then pending against her by Marjorie D. Harvey (Plaintiff's Exh. F). In that deposition, the Debtor testified that all of the stock that she and her husband had ever owned had been sold prior to the deposition. On March 31, 1989, at a deposition

for this adversary proceeding, the Debtor once again testified that all of the stock that she and her husband had ever owned had been sold prior to January 1989. (See Plaintiff's Exh. E) In fact, Debtor and her husband retained joint ownership of three (3) stocks in the following amounts:

17.6  shares of Walgreen stock
132.0  shares of Raven Industries, Inc. stock
630.0  shares of Tonka Corporation stock

In addition, the Plaintiff alleged that the Debtor still owned 250 shares of Frank's Nursery, Inc., stock, although evidence indicated that that stock had been sold just two weeks prior to the April 23, 1987, deposition and that the proceeds of that stock were deposited to an account jointly owned by the Debtor's husband and father-in-law. The Debtor's bankruptcy Petition disclosed the sale of over $8,000.00 worth of stock which was owned by the Debtor at the time the depositions were taken.

It is clear that all the stock was held jointly by the Debtor and her husband. It appears that although the Debtor generally opened all mail, whether addressed to herself or her husband, she did not read the mail, but rather only slit it open. The Debtor said that she did pay the household bills and handled the third class mail, but that mail relating to the stocks was clearly her husband's business. As to the Raven Industries, Inc., and Tonka Corporation stock, evidence indicates that the Debtor and her husband purchased the stock approximately twenty years prior to the filing of the bankruptcy Petition. After the Debtor and her husband moved from Illinois to Chicago in 1984, the certificates for the Tonka and Raven Industries, Inc., stock were kept in a safety deposit box to which the Debtor had no access. Access to the safety deposit box was exclusively within control of the Debtor's husband, John G. O'Neil, and his father, John L. O'Neil. Due to the Debtor's husband having sustained substantial financial difficulties in Illinois prior to moving to Florida, they had already begun to sell various assets, including approximately $100,000.00 worth of stock. In addition, less than four months prior to giving a deposition, Debtor and her husband had sold stocks which they held in Frank's Nursery, Inc., and Walgreen Corporation (Exh. Nos. 58 and 59) Proceeds from the sale of these stocks had been received only weeks prior to the Debtor's deposition (Exh. Nos. 75, 76, 77 and 78). In March or April of 1988, the Debtor received a newsletter from Raven Industries, Inc. (See Exh. No. 62), which gave rise to the sale of that stock as well as the Tonka stock (Exh. Nos. 60 and 61) Evidence also indicated that the Debtor and her husband participated in a dividend reinvestment program whereby the dividends from Walgreen stock were invested in the purchase of additional stock in the company, and when the Debtor and her husband sold the shares of Walgreen which they owned in late 1986, there were fractional shares of Walgreen stock which had accumulated in the dividend investment program. These shares were not disposed of prior to bankruptcy and were listed in the Debtor's schedules, and while the Debtor's tax return for 1985 reflected the receipt of dividends from Raven Industries, Inc., Tonka Corporation and Walgreen Corporation, the Debtor's 1986 federal income tax return was not filed until August 1987, four months after the deposition in which the Debtor testified that all stock had been sold.

In September 1986, the Debtor and her husband purchased real property known as, "The Grandview House". The Debtor and her husband intended, along with a partner, Barbara Stevens, to renovate this property and to operate it as a bed-and-breakfast facility. The property was opened as a bed-and-breakfast after several months of renovating, but was eventually closed due to zoning restrictions. The house was subsequently sold in June of 1987. All of the proceeds of the sale had been disbursed by August 6, 1987. The purchase price of the Grandview House was $300,000.00 (See Exh. Nos. 54 and 55). Coast Federal Savings and Loan Association provided a purchase money mortgage in the amount of $220,000.00 (Exh. Nos. 24, 25, 26, 27 and 28). The Debtor's husband, John G. O'Neil provided a $30,000.00 deposit toward the purchase of the property. Of the $30,000.00, $20,000.00 came from the

account of Siesta Enterprises, Inc. (Exh. Nos. 33 and 34). The balance of $10,000.00 was drawn on the account of John G. O'Neil or John L. O'Neil at Central National Bank (Exh. No. 31). Additional funds for the purchase of the property were provided by a line of credit at Central National Bank given to the Debtor's husband, John G. O'Neil. The Debtor's father-in-law, John L. O'Neil placed bearer bonds with the bank as security for the line of credit granted to his son (Exh. No. 35). John L. O'Neil subsequently paid the loan to Central National Bank and received the return of his bonds. Upon the satisfaction of the line of credit by John L. O'Neil, the Debtor and her husband executed a promissory note in his favor in the amount of $60,000.00 (Exh. No. 16). During the nine months that the Debtor and her husband owned the house, the Debtor prepared spread sheets indicating rental income from the property totalled $11,481.00. The sales price for the property at the closing on June 26, 1987, was $362,500.00 (Exh. Nos. 37 and 38). The seller's closing statement (Exh. No. 38) reflects that after expenses of the sale and deduction of the balance due on the mortgage owed to Coast Federal Savings and Loan, there was due to the seller at closing the sum of $139,198.11 (Exh. No. 38). The uncontradicted evidence presented at trial demonstrates these proceeds were disbursed as follows: The testimony and exhibits at trial indicated that $64,256.64 was paid to the Debtor's father-in-law in repayment of money that he had advanced to them. The balance of the proceeds, $74,941.47 was deposited into the Grandview House account, and the Debtor signed all the checks which disbursed the proceeds as follows: $32,520.00 was paid to John G. O'Neil and deposited into the Debtor and her husband's joint checking account. On the same day, a check for $25,030.80 was written on the joint account to a party holding a mortgage on the Debtor and her husband's homestead; $17,651.97 was paid to the partner, Barbara Stevens, as reimbursement for house expenses; $24,284.92 was paid to the Debtor's husband and deposited into the joint account of the Debtor's husband and his father. The $32,520.00 was a repayment of $30,000.00 put into escrow to purchase the Grandview House, together with interest on that amount.

At the beginning of the final evidentiary hearing, Plaintiff amended its Complaint to add an allegation under § 727(a)(5) of the Bankruptcy Code concerning the disposition by the Debtor of the proceeds of a treasury bill. In August of 1985, the Debtor and her husband purchased a $10,000.00 United States Treasury Bill through Dean Witter Reynolds, Inc. The treasury bill was redeemed one year later in August 1986. Proceeds of the treasury bill were deposited into the joint account of the Debtor and her husband at First Presidential Savings and Loan Association on September 2, 1986 (See Exh. No. 95). Proceeds from the treasury bill were deposited into the account at First Presidential Savings and used for various living expenses during the months following the deposit. There does not appear to be any specific tracing of those proceeds by the Plaintiff.

Basically, these are the salient facts as established at the duly scheduled final evidentiary hearing upon which Plaintiff's claim objecting to the Debtor's right to a general discharge is based pursuant to § 727(a)(2)(A) and § 727(a)(5) of the Bankruptcy Code which provide as follows:

§ 727. **Discharge**

(a) The court shall grant the debtor a discharge unless—

(2) the debtor, with intent to hinder, delay, or defraud a creditor or an officer of the estate charged with custody of property under this title, has transferred, removed, destroyed, mutilated, or concealed, or has permitted to be transferred, removed, destroyed, mutilated, or concealed—

(A) property of the debtor within one year before the date of the filing of the petition; or ...

(5) the debtor has failed to explain satisfactorily, before determination of denial of discharge under this paragraph, any loss of assets or deficiency of assets to meet the debtor's liabilities; ....

Under § 727 of the Bankruptcy Code, the burden is on the objecting party to prove that a debtor should be denied a discharge by way of clear and convincing evidence. Bankruptcy Rule 4005, *In re Bernstein,* 78 B.R. 619 (S.D.Fla.1987). In addition, § 727 must be construed liberally in favor of the Debtor and strictly against the creditor. *See In re Cutignola,* 87 B.R. 702 (Bkrtcy.M.D.Fla.1988). Actual intent by the debtor to conceal his property from his creditors is an essential element under § 727(a)(2)(A). *See In re Levine,* 6 B.R. 54 (Bkrtcy.S.D.Fla.1980). Moreover, actual fraudulent intent requires a showing of bad faith on the part of the debtor and actual fraudulent intent as distinguished from constructive intent must be the intent of the debtor, or the intent of someone acting for him. *See In re Haddad,* 10 B.R. 276 (Bkrtcy.D.Nev.1981). Therefore, in order to establish an objection to the debtor's general discharge, a concealment of assets by the debtor is not enough to deny his discharge under § 727(a)(2)(A); there must be a showing of actual intent to hinder, delay or defraud creditors. *See In re Irving,* 27 B.R. 943 (Bkrtcy.E.D.N.Y.1983). As to the concealment of stock, a review of the facts of this case demonstrates that the Plaintiff has not carried its burden of proving actual fraudulent intent by clear and convincing evidence. This Court is satisfied that the Debtor, who did not make any review of her assets prior to appearing for a deposition on April 23, 1987, for a state court suit, did not have the requisite intent to defraud the Plaintiff. As to the proceeds of the $40,000.00 cash bond, the Debtor has satisfactorily explained the disposition of the $40,000.00 which had been posted on behalf of her son, John Michael O'Neil, following his arrest in late 1985. Although the Debtor maintained a checking account, it is clear that the Debtor had not worked outside the home since 1984 and had no independent funds apart from her husband and her father-in-law. The Court is satisfied that the money for the cash bond came from two sources and that eventually the money was returned to those two sources, more specifically, the Debtor's husband and the Debtor's father-in-law.

As to the proceeds of the sale of the house commonly known as, "Grandview House", once again this Court is satisfied that the Debtor has satisfactorily explained the disposition of the $139,198.11. Further, this Court is satisfied that the Plaintiff has failed to carry its burden of proof in relation to the $10,000.00 treasury bill in that the Debtor satisfactorily explained the disposition of those proceeds as well. For the foregoing reasons, this Court is satisfied that the Plaintiff's Amended Complaint should be dismissed with prejudice.

A separate Final Judgment shall be entered in accordance with the foregoing.